STATE OF NEW JERSEY, PLAINTIFF - RESPONDENT, v. WILBERT SINCLAIR AND JESSE EDWARD WILSON, DEFENDANTS-APPELLANTS.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JESSE EDWARD WILSON, DEFENDANT-APPELLANT.

Argued June 5, 1967—Decided July 11, 1967.

528

Nos. A-157, A-158:

*Mr. Philip J. Mylod* argued the cause for the defendant-appellant, Wilbert Sinclair (*Messrs. Philip J. Mylod* and *Richard A. Walsh,* attorneys).

*Mr. Herman D. Michels* argued the cause for the defendant-appellant, Jesse Edward Wilson.

*Mr. James R. Zazzali,* Assistant County Prosecutor, argued the cause for the plaintiff-respondent (*Mr. Brendan T. Byrne,*

Prosecutor of Essex County, attorney; *Mr. Barry H. Even-chick,* Assistant County Prosecutor, of counsel and on the brief).

No. A-159:

*Mr. Herman D. Michels* argued the cause for the defendant-appellant.

*Mr. James R. Zazzali,* Assistant County Prosecutor, argued the cause for the plaintiff-respondent (*Mr. Brendan T. Byrne,* Prosecutor of Essex County, attorney; *Mr. James R. Zazzali,* on the brief).

The opinion of the court was delivered by

PROCTOR, J. Wilbert Sinclair and Jesse Edward Wilson after a joint trial were found guilty by a jury of first degree murder without a recommendation of life imprisonment on two indictments, one for the murder of Esther Friedman and the second for the murder of Shep Binyard. Each defendant was sentenced to death on both convictions and appeals to this Court under R. R. 1:2-1(c). Defendant Wilson also applied for post-conviction relief. The denial of this application is also before us on these appeals.

Prior to trial Sinclair moved for a severance. This motion was denied. It was repeated and again denied during the *voir dire* and during the trial itself.

Prior to trial the court conducted a preliminary hearing to determine the competency of Wilson to stand trial. Dr. Zigarelli, called by counsel for Wilson, testified that Wilson was a sociopathic personality with paranoid characteristics and was not able to communicate with counsel in his defense; however, treatment by tranquilizing medications for several months would sufficiently remedy the condition to enable Wilson to stand trial. Dr. Kesselman, called by the prosecution, and Dr. Flicker, called by the court, were in basic agreement with the diagnosis of mental impairment but concluded that Wilson had sufficient present mental capacity to under-

stand his situation and assist in his own defense. The court ruled that Wilson was fit to stand trial.

The principal prosecution witness, Abraham Friedman, testified that on the evening of October 24, 1964 at about 8:30 he was working in his package liquor store in Newark with his wife Esther. One customer, Shep Binyard, was in the store. Two "colored fellows" then walked into the store. In court Friedman identified the two men as defendants Sinclair and Wilson. Wilson attempted to sit down on a chair but fell. Sinclair sought to purchase first corn liquor and then other whiskey but was refused because Friedman thought Wilson was intoxicated. Sinclair then took out a gun and said: "[T]his was a stickup and if you be quiet nobody will get hurt." Mrs. Friedman then said: "[T]ake whatever you want but please leave us alone."

Sinclair then directed Wilson "to go behind the counter and go to the register to get the money." Wilson ordered Friedman "down toward the back of the counter, back of the store with him." Friedman said that Wilson did not know how to open the register, so he showed Wilson who then opened and reached inside the register after pushing a button and turning a handle. At this moment Shep Binyard, the customer, approached Sinclair and said: "Why don't you fellows be nice and let these good people alone?" Just after saying this, Binyard was shot by Sinclair. Then Sinclair moved toward the back of the store; but when Mrs. Friedman started to scream and tried to run out of the store, he followed her and shot her. Both shootings were fatal.

Wilson, who was still at the register with his hands inside it, was then struck on the head by Friedman with a bottle of whiskey. Friedman then ran into the rear of the store to a walk-in icebox which contained a burglar alarm. Wilson started to pursue him, and Friedman threatened him with a broken bottle. Wilson then turned, and seeing that Sinclair had gone, he ran out. Friedman pushed the alarm and went to look after his wife. No money was taken.

Friedman further testified that about 9:30 that evening he was taken to the Newark City Hospital by the police, saw Wilson there among several other people, and identified him as the man he had hit with the bottle. Later at police headquarters Friedman picked out from among eight to ten photographs shown to him by the police the photographs of Wilson and Sinclair as showing the men who were in his store. He also identified Sinclair that evening at the police station from among several Negro plainclothes men as the man who shot his wife.

Between 8:30 and 9:00 in response to the alarm about ten policemen and one newspaper reporter arrived at the store. One of the policemen, Officer Purcell, testified that when Friedman told him what had happened, no mention was made of Sinclair's saying "this was a stick-up." Also, no mention was made of Wilson opening the register. Rather, Friedman refused to sell Wilson and Sinclair liquor, and Sinclair took out the gun when Friedman tried to assist when Wilson fell. Sinclair said: "Stay away from him, everybody step back." Friedman then ran to the back of the store to sound an alarm, Wilson followed him, and the two men scuffled in the rear of the store. The fatal shots were fired after Wilson and Friedman fought and not before.

Detectives Moore and Farese testified that Friedman told them that evening at the store that one of the men had taken out a gun and announced a stick-up; however, they did not have in their joint report any mention of Wilson opening the cash register. Moore said that Friedman did not tell him that Wilson went to the cash register. Farese said that Friedman did mention Wilson going to the cash register, but the detail was not in the report because no money was taken and Farese thought he would remember the detail. Detective Alford also testified that Friedman said that evening at the store that one of the men had taken out a gun and announced a stick-up, but there was nothing in his report about the other man opening the cash register.

Officer Blasi at 8:40 that evening dusted the store for fingerprints but found none. He testified that he checked the cash register for prints, but his report said only that he checked two counter tops, a chair, and assorted bottles. Blasi said that he intended the reference to the counter top on which the cash register stood to include the register.

At 8:45 on the fatal evening Officers Patterson and Lebo, after receiving a general alarm on their police radio, proceeded to the general area where the crime had occurred, and saw a man on the street bleeding from his head. This man was identified as Wilson, and he told the officers that he had been mugged. The officers took him in their car and started to drive to Newark City Hospital. As they were driving a description of the two men involved in the liquor store killings came over their police radio, and Patterson called headquarters that he was taking a person who fit the description of a suspect to City Hospital and that eyewitnesses should be brought there.

Wilson was treated in the emergency room by a nurse who found slivers of glass in his head. The nurse also was present when Friedman saw Wilson there, and she testified that Friedman said: "He is the one I hit over the head. He is the one that robbed me, robbed us." Officers Patterson and Lebo also testified that Friedman identified Wilson at the hospital as the man involved in the shootings. Detectives Moore and Farese also testified that they observed Friedman make this identification.

While Wilson was giving a statement to the police at headquarters, he told them he had been with Sinclair, and police officers went to apprehend Sinclair. The police saw Sinclair walking near his mother's home, called for him to stop, and pursued him when he did not. The police observed him throw an object under a car shortly before he was arrested. The object was a gun. At trial expert evidence was given that the bullet fatal to Mrs. Friedman was fired from this gun, and the bullet which killed Binyard might have been fired from this gun. Sinclair was then taken to police headquarters.

Officers Alford, Guglielmo, and Buerle testified that they saw Friedman identify Sinclair at headquarters as the man who had shot his wife.

The prosecution also introduced expert testimony that the glass found in Wilson's head wound came from the bottle which Friedman had used to strike the man he said was Wilson. The expert said he found blood marks around the icebox in the rear of the store but none around the cash register. Also, this expert said that powder burns on Binyard and Mrs. Friedman indicated that both fatal shots were fired when the gun was within an inch of the victims.

Sinclair did not take the stand in his defense. He called Michael Unger, the newspaper reporter who was at the store that evening. Unger said he heard from Friedman in response to questions by police and himself a version of the events which did not include any mention of an attempted hold-up or any mention of Wilson opening the cash register; rather, Sinclair took out the gun after Friedman refused to sell him liquor. Unger also said that he asked Friedman if there was an attempted hold-up, and did not receive a direct answer: "What he did say was no, 'the men came in, they were drunk, I saw their condition and I refused.'" Sinclair also called Emma Davis, Wilson's sister, who testified she saw Sinclair and Wilson in a tavern in Newark on October 24 about 6:00 P. M., and both men were drunk, "very high." She also said that the two men tussled over some object but she did not notice what it was.

Sinclair objected when Wilson took the stand in his own defense. Sinclair called Dr. Liebhauser who testified that Wilson lacked sufficient mental ability to give competent testimony. The trial judge, after Wilson was examined in court by counsel and the trial judge as to his competency, and after referring to testimony from the pre-trial hearing to determine Wilson's capacity to stand trial, denied Sinclair's objection and ruled that Wilson was competent to testify.

Wilson told of his very limited education and of two severe head injuries he had received in 1956 and 1961 which sometimes caused him to black out. He said that starting at 4:00 P. M. on Friday, October 23 after he finished work, he had consumed large amounts of wine, whiskey and beer in the company of Sinclair and never wanted any corn liquor. He met his sister, Emma Davis, in a tavern on Saturday around 7:00 P. M. and showed her his gun which he had taken from her apartment shortly before. He then dropped the gun to the floor, and Sinclair picked it up and kept it.

Wilson testified he had no memory of what happened after seeing his sister until he found himself alone standing before the Robert Treat School. After walking a few blocks he noticed that he was bleeding from the head. At that spot, some six blocks from Friedman's liquor store, he met Officers Lebo and Patterson. He told the police he was mugged because he had some enemies in the area. He first requested that the officers take him to Bellevue Hospital, but after learning he was in Newark and after the officers said they were going to Newark City Hospital, he requested to be taken to Beth Israel Hospital saying he had hospitalization insurance.

Wilson did not deny that he might have been in the liquor store during the interval for which he claimed an absence of recollection, but did deny any intent to rob or kill either of the Friedmans or Binyard; all of whom he said he knew.

On cross-examination the prosecutor brought out Wilson's prior convictions for breaking and entering and larceny. He was shown the gun which the proof established was the murder weapon, and he identified it as the gun he had purchased on October 22. He was also cross-examined as to contradictions between his testimony and a statement (conceded by him to be voluntary) he had given to the police on the day following the killings. The statement said that Wilson was "trying to find me some corn liquor" on Saturday, that he had never seen the gun which was found when the police arrested Sinclair, and that Sinclair was with Wilson in front of the Robert Treat School.

Counsel for Wilson then introduced expert psychiatric testimony by Drs. Zigarelli and Schein that Wilson had a valid amnesia covering the interval between the time he saw his sister in a bar and the time he found himself before the Robert Treat School and was insane at the time of the killings within the meaning of the *M'Naghten* rule. The prosecution rebutted this testimony with opinions by Drs. Kesselman and Flicker that Wilson was sane under *M'Naghten* and that it was likely that the amnesia was feigned.

Prior to the summations the trial judge told counsel that he would charge the jury to bring in a verdict of first degree murder or acquittal, and that their requested instructions as to other degrees of guilt would be denied. Further, the trial judge told counsel to be guided in their summations by this ruling.

## I

The theory of the State was that the homicides were committed during an attempted robbery. The trial judge, accepting this theory, charged the jury:

"Now this is a first degree case. On the evidence presented to you, the defendants or one of them is guilty of murder in the first degree, or he or they are not guilty. We are not here concerned with any other degree of guilt."

The judge further instructed the jury that the only possible verdicts were: guilty of first degree murder, guilty of first degree murder with a recommendation of life imprisonment, not guilty, or—as to Wilson—not guilty by reason of insanity.

Both defendants urge that on the evidence the jury could have found either or both defendants guilty of murder without finding that a robbery was attempted, and that therefore the jury should have been instructed as to the proper verdict for such findings, second degree murder. Written instructions were submitted to the trial judge which included a charge as to second degree murder if the jury found no attempted rob-

bery occurred, and these requests were denied. Defendants also requested a charge on manslaughter on the contingency that the jury could find an unlawful homicide committed under mitigating circumstances without finding an attempted robbery, and this request was also denied.

An unlawful homicide is presumed to be second degree murder. *State v. DiPaola*, 34 *N. J.* 279, 294-295 (1961), *certiorari* denied 368 *U. S.* 880, 82 *S. Ct.* 130, 7 *L. Ed. 2d* 80 (1961). No evidence was presented at the trial from which the jury could find the circumstances of the killings were such as to alleviate the offenses to manslaughter. See *State v. Brown*, 22 *N. J.* 405, 410–411 (1956). The trial judge properly denied a request for a charge on manslaughter.

A murder committed in the course of the commission or the attempt to commit certain enumerated crimes including robbery is punishable as first degree murder. *N. J. S. A.* 2A:113–2. hen the State's thesis is that the murder occurred during a robbery or attempted robbery, the evidence at trial may be such that only by sheer speculation or compromise could the jury return a verdict other than guilty of first degree murder or not guilty; if so, it is proper not to instruct the jury that second degree murder is a possible verdict. *State v. Davis*, 50 *N. J.* 16 (1967) ; *State v. Pacheco*, 38 *N. J.* 120, 131 (1962). However, our cases also establish that if on the evidence it would not be *idle* to have the jury decide whether defendants committed an unlawful homicide other than in the course of an attempt to rob, it is error not to charge the possibility of a verdict of second degree murder :

"An unlawful homicide is murder in the second degree. It is incumbent upon the State to prove the additional element the statute, *N. J. S.* 2A:113–2, requires to elevate the offense to first degree, and on the thesis on which this case was tried, that additional element was an attempt to rob.

"Here there was no evidence affirmatively suggesting the killing was other than in the course of an attempt to rob. Still the question remains whether the State's proof as to an attempt to rob was so unequivocal as to make it idle to ask the jury to pass upon it. * * *

"A defendant who denies complicity does not thereby concede the criminal event was everything the State claims it was. It remains the burden of the State to satisfy the jury beyond a reasonable doubt that the murder was of the character the statute denounces as murder in the first degree. If under the proof there is in fact no room for dispute as to whether the killing occurred in the perpetration or attempt to perpetrate the felony, our cases say the issue should not be left to the jury. *State v. Zeller*, 77 *N. J. L.* 619 (*E. & A.* 1909) ; *State v. Giampietro*, 107 *N. J. L.* 120, 122 (*E. & A.* 1930) ; *State v. Pacheco*, 38 *N. J.* 120, 131 (1962). The cases elsewhere hold that if, on the trial of a first-degree charge, it 'appears clearly' from the evidence that the homicide was of no lower degree, the trial court 'may,' and some cases say 'should,' instruct the jury to find the defendant guilty of murder in the first degree or not guilty. 41 *C. J. S. Homicide* § 392, *p.* 209. To leave the issue of second-degree murder with the jury in such circumstances could conceivably lead to a compromise verdict. On the other hand, if the issue of second-degree murder is improperly taken from the jury, the jury might convict of first-degree or acquit a man whose guilt is of a lesser degree." *State v. Mathis*, 47 *N. J.* 455, 466–467 (1966).

See *State v. Wynn,* 21 *N. J.* 264, 270–271 (1956) and *State v. Sullivan,* 43 *N. J.* 209, 245 (1964), *certiorari* denied 382 *U. S.* 990, 86 *S. Ct.* 564, 15 *L. Ed. 2d* 477 (1966).

In the present case various factors in evidence directly or indirectly could be taken by the jury to show that no attempted robbery occurred even though the jury found that one or both defendants were guilty of murder. These factors are: 1) testimony by Officer Purcell and Michael Unger, the reporter, that Friedman did not tell them in relating the events that Sinclair announced "this was a stick-up" or that Wilson opened the cash register; rather, Friedman refused to sell the men whiskey because he thought they were drunk, and Sinclair took out the gun when Friedman tried to assist Wilson when Wilson fell while trying to sit down on a chair, 2) omission in police reports of references to the cash register, 3) omission in the report of the policeman who dusted for fingerprints of special attention to the cash register and the absence of any fingerprints on the register, 4) absence of blood on or around the cash register and the nearby floor, 5) the fact that the shot fatal to Binyard was fired within

an inch of him, perhaps suggesting a struggle consistent with the Purcell version that Sinclair said only "everybody step back," and 6) certain inconsistencies between the narration of the events given by Friedman to various persons on the evening of October 24 and his testimony at trial; *e. g.* differences in Sinclair's words after taking out a gun, whether Wilson opened the cash register, the place in the store where Wilson and he struggled, and whether the shots were fired before or after Wilson and he struggled.

We think that all these factors make it not idle to have the jury decide whether or not one or both defendants were guilty of murder even though no attempted robbery occurred. The defense need not offer affirmative proof, as urged by the State, that no attempted robbery occurred to be entitled to a charge on second degree murder; it is enough that the evidence leaves room for dispute as to whether the killings occurred during the course of an attempted robbery. *Mathis, supra,* 47 *N. J.,* at *pp.* 466–467. In the present case where the contention was vigorously advanced by defendants and written instructions were submitted, it was reversible error not to charge the jury that on such findings a verdict of second degree murder could be returned. (Defendants could also be found guilty of first degree murder even though no attempted robbery occurred if the State contended that the killings were premeditated, deliberate and willful, and the evidence supported this theory.) We realize that Friedman was under great emotional stress because of his personal tragedy, and that this might well account for any differences between his testimony at trial and the statements he made that evening. However, the jury is the proper body to determine questions of fact. It would at least be possible for a jury to accept Friedman's testimony at trial concerning the killings and yet conclude that he was mistaken as to the attempted robbery. See *State v. Wesler,* 137 *N. J. L.* 311, 314 (*Sup. Ct.* 1948), aff'd 1 *N. J.* 58 (1948) and *People v. Jeter,* 60 *Cal. 2d* 671, 36 *Cal. Rptr.* 323, 388 *P. 2d* 355, 358 (*Cal. Sup. Ct.*

1964). To force the jury to choose on the evidence in the case between first degree murder and acquittal raises the possibility that the defendants might have been convicted of first degree murder though their guilt was of a lesser degree. *Mathis, supra,* 47 *N. J.,* at *p.* 467. The possibility of prejudice is particularly acute in the present case because the trial judge informed counsel prior to their summations of his decision to charge only first degree and acquittal, and directed them to structure their arguments accordingly. Thus defendants were deprived of the opportunity to argue to the jury those factors which might show that their guilt—if the jury found them guilty—was of a lesser degree than first degree murder.

The trial judge did charge that if the jury found that no robbery occurred, then both defendants should be acquitted. The possibility that the jury might find that a murder occurred though no robbery was attempted applies most directly to Sinclair, the man who fired the fatal shots. However, Wilson could be guilty of second degree murder if he aided and abetted a second degree murder committed by Sinclair, and the version of the events by Purcell and Unger indicates such aiding and abetting because Wilson was struggling with Friedman while Sinclair was threatening and then firing at the other two victims in the store. Also, the gun used for the fatal shootings was owned by Wilson. Moreover, it would be anomalous to reverse as to Sinclair, the man who pulled the trigger, and at the same time affirm as to Wilson, whose guilt depends on a finding that Sinclair committed murder. See *People v. Schader,* 62 *Cal. 2d* 716, 44 *Cal. Rptr.* 193, 401 *P. 2d* 665, 675 (*Cal. Sup. Ct.* 1965) and *Commonwealth v. McCarthy,* 348 *Mass.* 7, 200 *N. E. 2d* 264, 268 (*Sup. Jud. Ct.* 1964).

We hold that on the facts of the present case it was error requiring a new trial as to both defendants for the trial judge to limit the jury to verdicts of first degree murder or acquittal.

## II

Because the case must be remanded for a new trial, we will proceed to consider other points claimed by the defendants to be error which may recur on the retrial.

Each defendant requested an instruction that if the jury found he was so prostrated by intoxication as to be unable to form a specific intent to attempt robbery, then such a condition would reduce a robbery-murder to murder in the second degree. The trial judge refused this requested instruction, and instead charged the jury that such a level of intoxication would be a complete defense and would require acquittal as to a defendant found to be so intoxicated. The prosecution argues that the charge given if anything was too favorable to the defendants, and therefore they have no cause to complain.

Our cases settle that prostration of the mental faculties by voluntary intoxication from alcohol or drugs cannot lead to acquittal but at the most can only prevent the elevation of degree of guilt from second degree murder to first degree murder, "and this upon the demands of public security." *State v. Trantino,* 44 *N. J.* 358, 369 (1965), *certiorari* denied 382 *U. S.* 993, 86 *S. Ct.* 573, 15 *L. Ed. 2d* 479 (1966), *reh. den.* 383 *U. S.* 922, 86 *S. Ct.* 901, 15 *L. Ed. 2d* 679 (1966); *State v. Wolak,* 26 *N. J.* 464, 477–478 (1958). This rule applies to felony-murder. See *State v. White,* 27 *N. J.* 158, 165–166 (1958) and *State v. Tune,* 17 *N. J.* 100, 115–116 (1954), *certiorari* denied 349 *U. S.* 907, 75 *S. Ct.* 584, 99 *L. Ed.* 1243 (1955).

In the present case there was evidence that both defendants were drinking heavily, and each defendant was entitled to the charge each requested as to the effect of intoxication in reducing the degree of guilt. On the retrial the trial judge should charge on intoxication in accordance with the above observations (assuming that the proofs warrant such a charge).

The defendants claim that, because there was no line-up, it was error to allow testimony by Friedman, police-

men and the nurse as to pre-trial identifications made by Friedman at City Hospital and police headquarters.[1] However, a pre-trial identification, if made under circumstances precluding unfairness and unreliability, is admissible where the person who made the identification is in court as a witness; and both the identifying witness and third persons can testify about such an identification. *State v. Matlack,* 49 *N. J.* 491 (1967); *State v. Williams,* 39 *N. J.* 471, 489, 189 *A. 2d* 193 (1963), *certiorari* denied 382 *U. S.* 964, 86 *S. Ct.* 450, 15 *L. Ed. 2d* 366 (1965). Although a line-up of men is a helpful and desirable police technique, the absence of such a procedure does not in itself make a prior identification unfair or unreliable: the totality of the circumstances must be considered. *Stovall v. Denno,* 387 *U. S.* ——, 87 *S. Ct.* 1967, 18 *L. Ed 2d* 1199 (1967); *State v. Matlack, supra,* 49 *N. J.,* at *p.* 491. In the present case Friedman had ample opportunity to observe the two men who committed the crimes in his store, and he identified both defendants within a few hours after the crimes when the events and recollections were still fresh in his memory. See *State v. Mallack, supra,* 49 *N. J.,* at *p.* 491. Moreover, Friedman before seeing Sinclair although after seeing Wilson picked out their photo-

[1] Defendants were not represented by counsel when Friedman saw them for pre-trial identifications. The United States Supreme Court has recently held that a post-indictment viewing of an accused by a witness arranged by the police to determine identification is a "critical stage" at which the accused has a Sixth Amendment right to be represented by counsel. *United States v. Wade,* 388 *U. S.* 218, 87 *S. Ct.* 1926, 18 *L. Ed. 2d* 1149 (1967) and *Gilbert v. California,* 388 *U. S.* 263, 87 *S. Ct.* 1951, 18 *L. Ed. 2d* 1178 (1967). In the present case the prior identifications occurred before and not after the indictment. However, we need not decide whether the *Wade* and *Gilbert* rule applies to pre-indictment identifications because the Supreme Court the same day held for substantial reasons of policy that the rule would only apply to identifications made after June 12, 1967, the day the opinions were rendered: "We hold that *Wade* and *Gilbert* affect only those cases and all future cases which involve confrontations for identification purposes conducted in the absence of counsel after this date." *Stovall v. Denno,* 387 *U. S.* ——, ——, 87 *S. Ct.* 1967, 18 *L. Ed. 2d* 1199 (1967). Defendants in the present case are therefore not entitled to assert the *Wade* and *Gilbert* exclusionary rule.

graphs from among those of eight or ten other persons.[2] We are satisfied that these identifications were made under circumstances which precluded unfairness and unreliability.

Defendants claim that the prior identifications should not have been admitted because, being made in their presence, the admission infringed on their Fifth Amendment right to silence. However, the prior identifications were not admitted because of a defendant's silence but because they were independently competent under our rules of evidence. Moreover, when requested by either defendant, the trial judge instructed the jury after testimony of a prior identification that the silence of a defendant in the face of an identification should not be construed as an admission of guilt. This instruction was repeated in the court's charge to the jury. We do not believe that the admission of testimony of pre-trial identifications under such conditions infringes upon a defendant's Fifth Amendment privilege against self-incrimination.

Defendants also argue that even if the fact of a prior identification is admissible, it was error to permit bolstering of Friedman's other testimony by allowing the nurse and policemen to give his words: e. g., "He is the one that robbed me, robbed us." When the nurse and policemen gave his words which included content relevant to what happened in the store, the source of these assertions rested not on their personal knowledge but on the out-of-court words of Friedman, and tended to give support to Friedman's in-court testimony concerning the events. Ordinarily it is improper to admit evidence to support the credibility of a witness except to meet a charge of recent fabrication of testimony. See Rule 20, *Rules of Evidence, L.* 1967, *c. 3* (effective date September 11, 1967). Our holdings that statements of prior identification are admissible when identity is at issue

---

[2] Friedman's inadvertent reference to a "Rogue's Gallery" picture of Sinclair was unfortunate. The trial judge quickly instructed the jury to disregard this remark. Court and counsel at retrial should try to see that such a remark is not repeated.

were not intended to sanction the bolstering of the credibility of a witness by allowing testimony of prior consistent statements on issues other than identity. Care should be exercised by the trial court that the proper admission of the fact of a prior identification does not become the vehicle to put improper hearsay or otherwise objectionable matter before the jury. In the present case the question of whether a robbery occurred was vital under the theory of the State's case. Allowing prosecution witnesses to repeat the out-of-court words of Friedman bearing on the question of robbery might mislead the jury into thinking these repetitions provided additional substantive proof that a robbery occurred. We note, however, that in view of the defense position that Friedman had told versions of the events to Purcell and Unger which did not include an attempted robbery, his prior consistent statements concerning robbery might well be admissible to rebut the claim of recent fabrication. See Rule 20, *Rules of Evidence, supra* and *People v. Singer,* 300 *N. Y.* 120, 121, 89 *N. E. 2d* 710, 711 (*N. Y. Ct. App.* 1949). At the retrial witnesses may testify as to the fact of a prior identification by Friedman, but should not give his words (if these are relevant to a matter at issue—as robbery) unless the prior consistent statements bearing on issues other than identity are admissible to meet a claim of recent fabrication.

 Defendants requested an instruction that would tell the jury it had to conceive of life imprisonment as imprisonment for life and nothing less. Their request, as worded, was inaccurate as it might mislead the jury into believing that its verdict could preclude a convicted defendant sentenced to life imprisonment from ever being released on parole. The request was properly denied.

 We have previously considered what a trial judge should do by way of instruction if the jury makes a special inquiry into the question of parole. See *State v. White, supra,* 27 *N. J.,* at *pp.* 178–179. In *White* we observed: "Doubtless most jurors have read of the parole of men sentenced for life." *Id.,* at *p.* 178. In view of the possibility that one or more

members of the jury may be troubled by the question of parole even though no special inquiry is made by them, and because of the effect which such a question may have upon the crucial choice of sentence between life and death, we think that on the request of a defendant the model charge set forth in *White* should be given (with the minor modification necessary because the instruction is not in response to a special inquiry).[3] See also *State v. Maxey*, 42 *N. J.* 62, 67 (1964).

Defendant Sinclair argues that the comments of the prosecutor in his summation that Friedman's testimony about the events in his store was "uncontradicted" infringed upon his Fifth Amendment privilege against self-incrimination. He contends that the jury, because of the prosecutor's comments, would likely be led into drawing an inference of guilt from his failure to take the stand.

The prosecutor has the right to make fair comment on the evidence and to argue to the jury the significance of the testimony presented, but when he begins to discuss the significance of what testimony was not presented and if it

---

[3] "Any prisoner serving a sentence of life is eligible for consideration for release on parole after having served 25 years of his sentence, less commutation time for good behavior and time credits earned and allowed by reason of diligent application to work assignments. The statute provides that no prisoner shall be released on parole merely as a reward for good conduct or efficient performance of duties assigned to him, but only if the State Parole Board is of the opinion that there is reasonable probability that, if such prisoner is released, he will assume his proper and rightful place in society, without violation of the law, and that his release is not incompatible with the welfare of society. A prisoner released on parole remains on parole for the balance of his life and if he violates the terms of the parole he may be returned to prison to serve the life sentence.

"[I] instruct you that the subject of possible parole must be excluded from your deliberations. You may not speculate as to whether parole would or would not be granted. So far as you are concerned, a life sentence is a life sentence. If upon and after consideration of all the evidence you believe a recommendation for imprisonment for life should be made part of your verdict, it would be a violation of your duty to refuse to make that recommendation because of the existence in another authority of the power and responsibility with respect to parole." *State v. White*, 27 *N. J.* 158, 179 (1958).

does not clearly appear that persons other than defendant could have been called, there is a danger that he may reflect upon a defendant's Fifth Amendment right to remain silent. See *Griffin v. California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed. 2d* 106 (1965) and *State v. Lanzo,* 44 *N. J.* 560 (1965). Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated. See *State v. Pickles,* 46 *N. J.* 542, 579 (1966). We do not mean to preclude the legitimate inferences from non-production of evidence to which the prosecutor may fairly refer. See *State v. Cary,* 49 *N. J.* 343, 353, 354 (1967), *State v. Clawans,* 38 *N. J.* 162, 170–171 (1962), and *Peeples v. U. S.,* 341 *F. 2d* 60 (*5th Cir.* 1965), *certiorari* denied 380 *U. S.* 988, 85 *S. Ct.* 1362, 14 *L. Ed. 2d* 280 (1965). However, in the present case we think that the repeated remark that Friedman's testimony was "uncontradicted"—in view of the testimony showing that only Sinclair and his co-defendant could deny the testimony of Friedman—did raise a danger that the jury would draw an improper inference from Sinclair's failure to take the stand. Therefore, at the retrial if these same circumstances recur, the prosecutor should refrain from arguing that Friedman's testimony about the events in his store was uncontradicted. See *Kitchell v. U. S.,* 354 *F. 2d* 715, 718–719 (*1st Cir.* 1966), *certiorari* denied 384 *U. S.* 1011, 86 *S. Ct.* 1970, 16 *L. Ed. 2d* 1032 (1966), and *Desmond v. U. S.,* 345 *F. 2d* 225, 226–227 (*1st Cir.* 1965).

Several alleged errors relate in whole or in part to the mental impairment of Wilson.

██ ██ Wilson claims that the trial judge erred in finding him competent to stand trial. A defendant is competent to stand trial if he can comprehend his position and consult intelligently with counsel in the preparation of his defense. See *State v. Lucas,* 30 *N. J.* 37, 72–74 (1959). Sufficient evidence was adduced at the pre-trial hearing to support the determination of the trial judge that Wilson was fit to stand

trial, and we see no reason to disturb this finding. See *State v. Caralluzzo*, 49 *N. J.* 152, 155–156 (1967).

 Defendant Sinclair urges that his right to a fair trial was prejudiced by requiring him to be tried in joint proceedings with a mentally disturbed co-defendant. Our rules provide that two defendants may be charged in the same indictment if they are alleged to have participated in the same act or transaction, *R. R.* 3 :4–8, and there may be a joint trial of both defendants charged under such an indictment. *R. R.* 3 :5–6. A defendant may move for a severance on the ground that a joint trial will prejudice his right to a fair trial, and the trial judge in his discretion may grant such relief, if any, which the court deems required by justice. *R. R.* 3 :5–7. A wide range of discretion necessarily reposes in the trial judge, and his decision in the present case was well within his permissible area of discretion. See *State v. Manney*, 26 *N. J.* 362, 368 (1958).

 However, several factors which occurred or emerged at the trial indicate that on the retrial we have already judged necessary it would be better if Sinclair is tried separately: 1) expert witnesses for all parties were in agreement that Wilson is a sociopathic personality with paranoid characteristics and very low intelligence; 2) Wilson insisted on conducting parts of his own defense, ignoring the advice of his able trial counsel, cross-examining several State's witnesses in a way thought harmful by defense counsel, and interrupting the proceedings at various times; and 3) Wilson took the stand and Sinclair did not. Although we do not need to decide whether any one of the above factors would be sufficient reason for severance, the combination of them convinces us that the cause of justice would be better served by trying Wilson and Sinclair separately if either so requests by moving for a severance.

Other arguments made by defendants need no discussion as they are plainly without merit or derive from circumstances not likely to recur at retrial.

## III

At the trial some confusion occurred when the court clerk requested the foreman to give the jury's verdict on the two indictments. The clerk identified the indictments only by number and did not say what was the substantive charge of each indictment.

■ Although the confusion of the foreman was rapidly cleared up and there was no error because of it, we think it better for clerks to preclude this possible source of confusion on the part of laymen unfamiliar with legal procedure by referring to the substantive crime charged in an indictment when asking the foreman for the jury's verdict.

## IV

Wilson also petitioned for post-conviction relief. His main point on this petition was that he had been denied the effective assistance of counsel. Of course, this claim is now moot. However, we note that prior to trial the court at the request of Wilson relieved one assigned counsel (now a judge) and assigned another attorney to conduct Wilson's defense. We have carefully reviewed the briefs on this matter and the record of the entire case and conclude that Wilson's trial counsel performed most ably under extremely difficult circumstances, and his conduct in representing Wilson was in the finest tradition of our bar.

Other points raised by Wilson in his petition for post-conviction relief need no discussion as they are plainly without merit.

## V

■■ At the trial Wilson at times insisted upon conducting his own defense, cross-examining witnesses himself, and making legal arguments to the court; at times he disagreed with decisions made by his trial counsel. The trial judge sometimes permitted Wilson to participate in his own defense and sometimes did not. We think that the trial

judge properly exercised his discretion in handling this very difficult situation. However, since there must be a retrial, and since Wilson has had the opportunity to see the difficulties and hazards of participating as an attorney in his own defense, we think he should be put to a choice. If after consultation with counsel he wishes to conduct his own defense and so informs the trial judge in open court, he may do so though counsel should nevertheless be assigned to aid him and be available at all times in the courtroom to give such help as is requested. But if Wilson requests that the court appoint counsel to act on his behalf and if Wilson agrees that he is to be so represented, then we think that the orderly course of justice would be better served by not allowing Wilson intermittently to assume the role of attorney. Of course, the trial judge should remain free to modify our suggestion as circumstances may indicate. See *State v. Davis,* 45 *N. J.* 195, 198–199 (1965).

## VI

For the reasons stated in Part I of this opinion the cause is reversed and remanded for new trial as to both defendants.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For affirmance*—None.