Accordingly, for the above reasons, plaintiff's motion for preliminary injunction is denied.

The Court adopts this memorandum opinion as its findings of facts and conclusions of law, and the clerk of the Court is directed to prepare and enter the proper order as set out above.

UNITED STATES of America ex rel.
Jesse Edward WILSON, Petitioner,

v.

ESSEX COUNTY COURT, LAW DIVISION, Respondent.

Civ. A. No. 1168–73.

United States District Court,
D. New Jersey.

Jan. 19, 1976.

Roger A. Lowenstein, Federal Public Defender by Michael J. Marucci, Asst. Public Defender, for petitioner.

Joseph P. Lordi, Essex County Prosecutor by Francis J. Badach, Asst. Prosecutor, for respondent.

## OPINION

STERN, District Judge.

Petitioner Jesse Edward Wilson seeks a writ of habeas corpus [1] on the basis of three alleged constitutional violations during his second state trial for the murders of Shep Benyard and Esther Friedman. The state proceedings at issue here were the result of the reversal by the New Jersey Supreme Court of petitioner's first murder conviction for these murders, after a joint trial with a codefendant, Wilbert Sinclair, who had actually fired the shots which killed Benyard and Friedman. *State v. Sinclair*, 49 N.J. 525, 231 A.2d 565 (1967). The Court held

1. This petition was filed on August 13, 1973. It was reassigned to this Court on March 6, 1974. On September 20, 1974, the Court received a letter from the Federal Public Defender, in which he enclosed a letter from petitioner requesting the assignment of counsel. The Federal Public Defender was assigned to represent petitioner by order of October 3, 1974. On June 2, 1975, having had no communication from the Federal Public Defender with regard to the prosecution of this petition, the Court wrote the Assistant Federal Public Defender to whom the case had been assigned:

My records reflect that you were appointed to represent the petitioner in the above-captioned case on October 3, 1974. As of this date, no brief has been submitted on behalf of the petitioner. Please take appropriate action in representing the petitioner so that the final disposition of this case will not be further delayed.

The Court still had received no brief on petitioner's behalf by August 4, 1975, and accordingly directed the Assistant Federal Public Defender to appear before the Court on that date to report on the status of the case. The memorandum in support of the petition was filed on August 5, 1975. Respondent's memorandum in opposition was filed on September 16, 1975.

that the first trial judge had erred in limiting the jury's alternatives, as to petitioner, to verdicts of guilty of first-degree murder (on a theory of felony murder) or not guilty, failing to instruct the jury that it could· return a verdict of guilty of second-degree murder as to him. 49 N.J. at 539, 231 A.2d 565.

Following the suggestion of the Supreme Court in *Sinclair*, 49 N.J. at 550, 231 A.2d 565, the State retried petitioner alone. The jury on this occasion was offered a choice among first-degree murder (on a felony murder theory), second-degree murder and outright acquittal. Once again a jury found it proved that petitioner had been a participant in an attempted robbery of the liquor store operated by Abraham and Esther Friedman in Newark, on the evening of October 24, 1964. The State proved, and the jury necessarily found, that during an attempted robbery the two decedents were shot and killed by petitioner's companion and co-conspirator, Sinclair. Petitioner was convicted of first-degree murder (felony murder) and sentenced to death, after the second jury, like its predecessor, refused to recommend life imprisonment. The New Jersey Supreme Court affirmed this second conviction. *State v. Wilson*, 57 N.J. 39, 269 A.2d 153 (1970). The sentence has since been amended to life imprisonment. Petition, ¶ 4.

The petition makes the following three allegations of error in the trial:

(a) The court improperly admitted into evidence against the defendant testimony concerning the actions taken by defendant's principal, Sinclair, after the crime had been committed and while the defendant, Wilson, was in custody.

(b) The trial court erred in denying the Defendant's motion at the conclusion of the State's case to eliminate felony murder from jury consideration.

(c) The Court erred in failing to charge manslaughter since the evidence, [sic] as to an attempted

robbery was not so unequivocal as to make it idle to ask the jury to pass on such evidence.

Petition, ¶ 11.

Petitioner has exhausted his state remedies with regard to the first two claims, and those issues are accordingly appropriate for disposition here. Title 28 United States Code, § 2254(b); *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). The issue of the manslaughter charge, although raised to the New Jersey Supreme Court on appeal from the first conviction and rejected in *State v. Sinclair, supra*, was not raised on appeal from the second conviction. It may be that petitioner has therefore not exhausted state remedies on this issue. The Court need not reach the issue of exhaustion, however, since it has nevertheless considered all three claims on their merits and finds that the petition must be denied. *United States ex rel. Kelly v. Maroney*, 414 F.2d 1228, 1231 (3rd Cir. 1969).

Both parties rely on the facts as set out by the New Jersey Supreme Court in *State v. Sinclair* and *State v. Wilson, supra*. Memorandum of Petitioner, at (a); Answer, at 2. In *Wilson*, Justice Proctor summarized the factual background:

> The principal prosecution witness, Abraham Friedman, testified that at about 8:30 P.M. on October 24, 1964, he and his wife, Esther, were working in his package liquor store in Newark. One customer, Shep Binyard, was also in the store. Two men, later identified by Friedman as Wilson and Sinclair, entered the store. Wilson attempted to sit on a chair but fell. Binyard tried to help him up, but Wilson refused the help and got up himself and sat on the chair. Sinclair sought to purchase some "corn whiskey" or "bootleg whiskey," but was refused because Friedman thought Wilson looked "kind of under the weather."
>
> Sinclair then drew a gun and said: "This is a stickup and just be quiet and nobody will get hurt." Mrs.

Friedman implored, "Take whatever you want, but just leave us alone." Sinclair then directed Wilson to go behind the counter. Wilson did so and began walking toward the cash register which was on the far end of the counter. At that time Binyard approached Sinclair and said, "Why don't you fellows be nice and leave these good people alone?" As soon as Binyard said this, Sinclair shot and killed him. At this time Wilson was behind the counter in front of the cash register, and he tried to open it. He was at first unable to do so, but after receiving instructions from Friedman, he succeeded. Mrs. Friedman "got sort of hysterical" and ran out of the store screaming for help. Sinclair turned and fired at her. At the time of this shooting, Wilson had his hands in the register. Sinclair ran out of the store, and Wilson was left alone with Friedman. Friedman then picked up a bottle of whiskey and hit Wilson over the head, breaking the bottle. Wilson stood stunned for a moment, and Friedman ran toward a burglar alarm in an icebox at the rear of the store. Wilson followed until Friedman threatened him with the broken bottle which he still held. Wilson stood still for a second or so, looked around the store, and ran out. Friedman then went into the walk-in refrigerator and sounded the burglar alarm. Afterwards, he left the store and found his wife lying on the sidewalk, and with some help from passersby, he carried her into the store and sat her on a chair. He learned later at the hospital that her wound had been fatal.

The police arrived three to five minutes after the alarm was sounded and questioned Friedman regarding the shootings. They then took him to the hospital to see about his wife's condition. While there he identified Wilson as "the man that was in my store that I hit over the head with the bottle." Wilson was being treated in the hospital for the head injury he received; he had been picked up by the police several blocks from the Friedman store.

After he learned that his wife was dead, Friedman was taken back to the store where he, his son, and the porter closed up. As far as he knew, no money had been taken from the cash register. The police then took Friedman and his son to police headquarters where he was shown about six or eight photographs in a group from which he identified Wilson and Sinclair. Friedman then gave a statement to the police. As he was leaving the police station, he happened to look in an interrogating room and saw Sinclair whom he identified.

The State also presented several police officers who went to the store to answer the alarm. Detectives Farese and Moore testified that when they arrived at the store, Friedman told them that there had been a stickup, and "there was shots fired, and his wife got hit and the patron got hit." Friedman was hysterical, worried about his wife, and had to be asked questions three or four times. Moore testified that the cash register was open three or four inches. Officer Di Blasi, a fingerprint identification expert, testified he found no finger prints of value anywhere in the store.

Detectives Alford and Farese testified to the circumstances of Sinclair's arrest over defendant's objections. They said they saw Sinclair walking near his mother's home. They called for him to halt and when he did not they pursued him. About fifty yards away, in a parking lot, Sinclair sat down on a log and threw an object under a car. This object was later identified by an expert as the gun which killed Mrs. Friedman and probably that which killed Binyard. Sinclair was arrested following his pursuit and taken to police headquarters where he was identified by Friedman.

The State also presented testimony that when Wilson was treated at the hospital for the wound on his head, slivers of glass were found on his jacket. An expert later identified this glass as part of the bottle which

Friedman had used to strike the man he identified as Wilson.

The final evidence produced by the State was portions of Wilson's testimony from the first trial. These were read to the jury over defendant's objections. In this prior testimony, Wilson said that he had known Sinclair for about twelve years. On October 23, he left work late in the afternoon and began drinking. Without going into the details, it appears that he went on drinking intermittently until the next evening when the shootings occurred. That night, at about 7:00 o'clock, he and Sinclair went to Wilson's sister's house to get a gun which Wilson had obtained two days before. The sister was not there and they entered by forcing the locked door. The pair then left for a bar where they found Wilson's sister. Wilson testified that while at the bar, he dropped the gun on the floor and that Sinclair picked it up and kept it. Sinclair also obtained the bullets from Wilson but it is not clear whether these were also picked up off the floor. The next thing Wilson remembered was being on the street with a bleeding hand.

The defendant did not take the stand in the present trial but produced several witnesses on his case. Only two gave testimony of any significance. Officer Purcell testified that he responded to the alarm and that when he arrived, two officers were already present at the scene of the crime. He was in the store for about a half hour during which he asked Friedman questions regarding the shootings and listened while the other officers questioned him. Purcell filed a report in which he did not mention any attempted robbery, and he testified that "to the best of my knowledge" Friedman never told him of any attempted robbery, but rather that Sinclair took out a gun after Friedman refused to sell him liquor.

Milton Unger, a newspaper reporter, testified that in response to questions by himself and police, Friedman gave a version of the events which did not include mention of an attempted hold-up or any reference to the opening of the cash register. Friedman had said that the shootings took place after one of the men "took out a gun and demanded liquor."

57 N.J. at 42–46, 269 A.2d at 155–156.

A. *Admission of Testimony Regarding Sinclair's Acts After the Commission of the Crime.*

The trial court permitted a Newark police detective to testify that, approximately two hours after the shootings, he and five other officers went to Sinclair's mother's home. Nearby they observed a man who later proved to be Sinclair walking east along the north side of Twelfth Avenue toward the house. The officers began to walk towards Sinclair and instructed him to halt. According to the testimony, when they shouted "halt" Sinclair "seemed to quicken his pace" and they pursued him. Just before his capture, the detective testified, Sinclair was seen to throw an object under a car. The object was retrieved and identified as the murder weapon. (Tr. 522–524: 750)

Defense counsel objected to this testimony concerning Sinclair's actions after petitioner had been taken into custody. (Tr. 517–518) The objection was overruled, and the Supreme Court agreed that the evidence was admissible. 57 N.J. at 51–52, 269 A.2d 153.

 This Court cannot find deprivation of any federally-guaranteed right in the reception of the evidence. Although every conspiracy does not necessarily include an implicit agreement to prevent detection and punishment, *Krulewitch v. United States,* 336 U.S. 440, 443–444, 69 S.Ct. 716, 93 L.Ed. 790 (1949), "[i]t does not necessarily follow that acts and declarations made after the conspiracy ended are not admissible." *Lutwak v. United States,* 344 U.S. 604, 617, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953). If an act committed by one of the conspirators after the conspiracy has ended is relevant to prove "the essential fact of the conspir-

acy," evidence of that act is competent. *Lutwak v. United States, supra.*

▌ In any event, this Court agrees with the New Jersey Supreme Court that when Sinclair attempted to discard the weapon, the conspiracy had not yet ended. "The disposal of the murder weapon by a coconspirator fleeing from the police is an act in furtherance of the conspiracy and probative against both conspirators." 57 N.J. at 51, 269 A.2d at 159. This rule of evidence is not unreasonable, shocking or otherwise impermissible under the federal Constitution. *Cf. United States v. Armocida*, 515 F.2d 29, 47 (3rd Cir. 1975).

▌ Evidence of Sinclair's flight was admitted only with reference to the circumstances surrounding the disposal of the weapon. Indeed the trial court did not charge Sinclair's flight at all, limiting its discussion of flight to the evidence of petitioner's own actions after the crime. (Tr. 998) The police testimony regarding the disposal of the weapon by Sinclair was admissible to support the introduction of the murder weapon, and therefore probative of the crime charged. *United States v. Costello*, 352 F.2d 848, 854 (2nd Cir. 1965).

The murder weapon was admissible against both alleged perpetrators, since proof of Sinclair's possession of petitioner's gun while he and petitioner were in the store together was admissible against both. Thus the fact that petitioner's gun was found in Sinclair's possession, a mere two hours after the crime, was admissible against both Sinclair and petitioner as tending to prove that it was in Sinclair's possession when he and petitioner were in the liquor store. The State was entitled to use this proof, and could do so only by proving the circumstances under which the weapon was found in Sinclair's possession approximately two hours after Sinclair fled the store. The fact that petitioner's gun was retrieved from where Sinclair had thrown it, rather than from Sinclair's hand or pocket, did not improperly prejudice petitioner or have any impact on his case.

B. *Denial of Petitioner's Motion to Eliminate Felony Murder.*

▌ At the conclusion of the State's case, petitioner moved for a judgment of acquittal on the allegation of first-degree murder, which the State had predicated on a theory of felony murder in the robbery of the store. The motion was denied. (Tr. 828–830) Petitioner's brief on appeal to the Supreme Court of New Jersey, Exhibit R–2 herein, acknowledges that the appropriate test for the trial court on this motion was "whether the evidence before the trial court, viewed in its entirety, and giving the State the benefit of all legitimate inferences therefrom, was such that the jury could properly find, beyond a reasonable doubt, that the defendant had [committed the crime charged]." R–2, at 34. *Cf. State v. Fiorello*, 36 N.J. 80, 90–91, 174 A.2d 900 (1961), *cert. denied*, 368 U.S. 967, 82 S.Ct. 439, 7 L.Ed.2d 396 (1962); *State v. Graziani*, 60 N.J.Super. 1, 13, 158 A.2d 375 (App.Div.1959), *aff'd*, 31 N.J. 538, 158 A.2d 330 (1960), *cert. denied*, 363 U.S. 830, 80 S.Ct. 1601, 4 L.Ed.2d 1524 (1960).

Since the State relied solely on the theory of felony murder to support the charge of first-degree murder, the inquiry before the trial court was whether there was sufficient evidence for the jury reasonably to conclude, beyond a reasonable doubt, "that Wilson participated in an attempted robbery during which Sinclair shot and killed two people." 57 N.J. at 52, 269 A.2d at 159.

The only living witness to the events in the liquor store on the night in question was Abraham Friedman. Friedman testified that Sinclair and petitioner entered the store a few feet apart, and that petitioner attempted to sit down but fell off the chair. (Tr. 383) Sinclair asked Friedman whether he had any corn whiskey, and Friedman replied in the negative, according to his testimony, because he was "leery" of selling petitioner any whiskey in view of his having fallen off the chair. *Id.* Sinclair then asked Friedman if he had any bootleg whiskey, and Friedman replied that he

carried none. *Id.* Friedman testified that Sinclair then turned to petitioner and said: "Well, what do you know? He don't have no corn whiskey and he don't have no bootleg whiskey." *Id.* Petitioner made no reply, according to Friedman, and Sinclair thereupon pulled out a gun and said: "This is a stickup and just be quiet and nobody will get hurt." (Tr. 383–384) The decedent Esther Friedman told Sinclair, according to her husband, to "take whatever you want, but just leave us alone." (Tr. 384) After Sinclair announced the robbery, according to Friedman, Sinclair told petitioner to go behind the counter. Petitioner complied and approached the cash register. (Tr. 384–385) The decedent Benyard, a customer in the store, then approached Sinclair and said to him, according to Friedman: "Why don't you fellows be nice and leave these good people alone?" (Tr. 385) Sinclair immediately shot Benyard, *id.,* and petitioner, who was behind the counter when the shot was fired, went to the register and began to open it, according to Friedman's testimony. (Tr. 386) Mrs. Friedman then ran hysterically from behind the counter out the door of the store, "screaming, hollering for help." (Tr. 386–387) Sinclair fired one shot at her and fled the store. (Tr. 387) By that time, Friedman testified, petitioner had his hands in the register drawer. Finding himself alone with petitioner, Friedman struck him over the head with a bottle of whiskey. *Id.* Friedman retreated into the walk-in refrigerator, where petitioner began to follow him. (Tr. 390) Friedman brandished the broken liquor bottle at petitioner, warning that "if he got any closer to me I would cut him up to ribbons." Petitioner ran out of the store. *Id.*

The defense produced two witnesses, a policeman and a reporter, who testified that Friedman made no mention of an attempted robbery in recounting the events that led to the shootings. It was their testimony, in substance, that Friedman had indicated only that he had refused to sell the perpetrators liquor because they appeared to be drunk, and that one had thereafter pulled a gun.

(Tr. 709–710, 848) Two other police witnesses, however, testified that Friedman told them the incident had involved an attempted robbery. (Tr. 506, 547)

The New Jersey Supreme Court concluded that, under the applicable legal standard, the trial court correctly denied petitioner's motion to eliminate felony murder from the jury's consideration. 57 N.J. at 52, 269 A.2d 153. After making an independent review of the evidence and applicable legal standard, this Court finds no error in that conclusion. Friedman was the only witness to the crime, and his testimony clearly established an attempted robbery. The issue was only of credibility and the jury was entitled to believe his account, notwithstanding the possibility that he might have neglected to inform the police and the reporter of the attempted robbery when they questioned him in the anguish and confusion of the crime's immediate aftermath. It should be noted that petitioner admitted having purchased the weapon two days before the shootings, in testimony given at the first trial and read into the record at the second trial (Tr. 825), and to having had it on his person on the night in question (Tr. 821), after having forced the door of his sister's house to get it. (Tr. 826–827) The jury was entitled to conclude that petitioner had armed himself to commit the crime which Friedman had ascribed to him and Sinclair. Accordingly, petitioner's second allegation of error is rejected.

### C. *Omission of the Manslaughter Charge.*

The New Jersey Supreme Court reversed the first trial of Sinclair and petitioner on the basis of the trial court's failure to charge second-degree murder.

At the second trial, the court delivered the following charge with regard to the applicable degrees of homicide:

> The law, members of the jury, presumes that all unlawful homicides or killings are murder in the second degree, and it is the duty of the jury to proceed upon that presumption, namely, that all unlawful homicides or kill-

ings are murders in the second degree. That presumption, of course, is a rebuttable one, and it is for you, members of the jury, to determine whether or not the presumption of murder in the second degree has been rebutted assuming, of course, you find the defendant has committed an unlawful homicide.

Now, that presumption, that an unlawful killing is second-degree murder, can be rebutted, members of the jury, in two ways: upward and downward. It can be rebutted upward by the State showing beyond a reasonable doubt that the killing was first-degree murder. It can be rebutted downward if the evidence shows that indeed it was not second-degree murder but was no more than *manslaughter, with which we are not concerned here. Again, let me point out to you that we are not concerned with the downward grade of this murder to manslaughter.*

As I have indicated to you before, this defendant may be found guilty of murder in the first degree, guilty of murder in the first degree with a recommendation, guilty of murder in the second degree or not guilty. *The question of manslaughter plays no part in your consideration in this particular case.*

(Tr. 989–990) (Emphasis added)

Petitioner alleges that the state court's exclusion of manslaughter from the jury's consideration was error, on the ground that "the evidence as to an attempted robbery was not so unequivocal as to make it idle to ask the jury to pass on such evidence." Petition, ¶ 11. Petitioner relies on *United States ex rel. Matthews v. Johnson,* 503 F.2d 339 (3rd Cir. 1974) and *Mullaney v. Wilbur,* 421 U.S. 684, 688–692, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), to support his contention that the trial court's failure to charge manslaughter deprived petitioner of the due process rights guaranteed him by the Fourteenth Amendment.

The Court of Appeals' approach to the constitutional issues in *Matthews* turned on peculiarities in the substantive law of Pennsylvania. The determination of the instant claim, however, must turn on the substantive law of New Jersey. In Pennsylvania, according to the Court of Appeals' citation of an opinion of the Pennsylvania Supreme Court, a jury may return a verdict of voluntary manslaughter where it finds a killing to have been intentional but without malice, as a result of the influence of sudden passion caused by legally adequate provocation placing the defendant beyond the control of reason. 503 F.2d at 341, citing *Commonwealth v. Matthews,* 446 Pa. 65, 285 A.2d 510, 517 (1971).

Pennsylvania law, however, does not limit a verdict of voluntary manslaughter to instances of sudden passion. Justice Pomeroy's opinion in *Matthews* acknowledges this principle:

Pennsylvania courts have long accepted the common law rule that the jury has the power to find a defendant guilty of voluntary manslaughter even in the absence of passion or provocation, where the evidence is sufficient to support a first or second degree murder verdict. . . . Although superficially such a rule may seem incongruous, it does have a rational basis. In essence, the rationale of the rule is founded on two considerations: (1) the legal concept that voluntary manslaughter is by definition a lesser offense than murder but one included within a murder indictment, (2) a realistic appreciation of the fact that factors such as sympathy or extenuating circumstances may lead a jury to find a defendant guilty of the lesser included offense of voluntary manslaughter even though the evidence is enough to establish guilt of murder in the second or even the first degree. . . .

503 F.2d at 341.

The Court of Appeals also noted that Pennsylvania law "gives a trial judge *complete discretion* in deciding whether or not to submit voluntary manslaughter to the jury as a possible verdict in a case where there is no evidence of passion or

provocation." *Id.* (Emphasis added) The Third Circuit wrote:

> The genesis of the federal constitutional problem is the anomaly that although the jury has unfettered power to return a voluntary manslaughter verdict as a lesser included offense of a murder indictment, it could not do so if the trial judge refused to charge on this point. Thus, whether the jury was given this opportunity was solely dependent on the unrestricted discretion of the trial judge.

503 F.2d at 342 (footnote omitted).

It was the holding of the Court of Appeals, in this substantive context, that "[t]o deny appellee the possibility of a lesser restraint of liberty because of a practice which permits arbitrary trial court activity is offensive to those settled concepts of due process." 503 F.2d at 345.

■ The substantive law of New Jersey, however, is quite different. This Court has discovered no New Jersey case which holds that a jury may return a verdict of manslaughter in the absence of evidence which would justify the verdict, or that the trial court has unfettered discretion to administer a manslaughter instruction in the absence of such evidence. Under the law of New Jersey, as interpreted by its Supreme Court, passion and provocation must appear for a distinction to be made between murder and voluntary manslaughter:

> Manslaughter is nowhere defined in our statutes, although punishment for conviction of the crime is specified. N.J.S.A. 2A:113–5. Generally this crime is subdivided into (1) voluntary or intentional and (2) involuntary or

**2.** In *State v. Brown,* the Court defined manslaughter:

> At common law as a general rule all homicide is malicious, and amounts to murder, unless where *justified* by the command or permission of the law; *excused* on the account of accident or self-preservation, or *alleviated* into manslaughter, by being either the involuntary consequence of some act, not strictly lawful, or (voluntary) occasioned by some sudden and sufficiently violent

unintentional, manslaughter. . . . The latter, involuntary manslaughter, is an unintentional homicide, committed without excuse or justification, under circumstances not manifesting or implying malice. . . .

> Voluntary manslaughter, on the other hand, is an *intentional* homicide done in sudden passion or heat of blood, without malice aforethought. . . . It has been said with respect to an intentional killing that "to reduce the crime from murder to manslaughter it must appear that the killing occurred during the heat of a passion resulting from a reasonable provocation, a passion which effectively deprived the killer of the mastery of his understanding, a passion which was acted upon before a time sufficient to permit reason to resume its sway had passed." *State v. King,* 37 N.J. 285, 300, 181 A.2d 158, 166 (1962).

*State v. Bonano,* 59 N.J. 515, 522–523, 284 A.2d 345, 349 (1971).

In determining that the trial court erred in the first trial of Sinclair and petitioner in failing to charge second-degree murder, the New Jersey Supreme Court also held that the trial judge had correctly refused to charge manslaughter:

> An unlawful homicide is presumed to be second degree murder. . . . No evidence was presented at the trial from which the jury could find the circumstances of the killings were such as to alleviate the offenses to manslaughter. See *State v. Brown,* 22 N.J. 405, 410–411, 126 A.2d 161 (1956). The trial judge properly denied a request for a charge on manslaughter.

*State v. Sinclair, supra,* 49 N.J. at 540,[2] 231 A.2d at 572.

> provocation. Manslaughter is the unlawful killing of another without malice, either express or implied, which may be either voluntarily, upon a sudden heat, or involuntarily, but in the commission of some unlawful act. And at common law all homicide is presumed to be malicious until the contrary "appeareth upon evidence."

22 N.J. at 410–411, 126 A.2d at 163 (Emphasis in original).

The record does not reveal any request by petitioner for a manslaughter charge at his second trial, the trial in question here. This Court has nevertheless examined the issue on the merits, and concludes that petitioner was not entitled to such a charge in this case.

 It is clear from the foregoing cases that New Jersey, unlike Pennsylvania, views manslaughter as "an offense distinct from and not a degree of murder," 22 N.J. at 411, 126 A.2d at 164, that in New Jersey a jury does not have the automatic right to return a verdict of manslaughter in any murder prosecution, that the trial judge must determine whether the evidence in the case warrants a manslaughter instruction before administering one, and that his decision is subject to review. *State v. Gosser,* 50 N.J. 438, 453–454, 236 A.2d 377 (1967), *cert. denied,* 390 U.S. 1035, 88 S.Ct. 1434, 20 L.Ed.2d 295 (1968). Thus the anomaly which confronted the Court of Appeals in *Matthews* is not present here, since there was no failure to instruct the jury fully with regard to all the options afforded it by New Jersey law in judging the facts of the case on trial. Under these circumstances, this Court is satisfied that no federal right is abridged when no manslaughter charge is administered because a judge determines that no rational view of the evidence would support it. *Cf. United States ex rel. Victor v. Yeager,* 330 F.Supp. 802, 805 (D.N.J.1971).

Petitioner's reliance on *Mullaney v. Wilbur, supra,* is misplaced. In that case, the United States Supreme Court found that respondent Wilbur had been charged with killing one Claude Hebert. The principal evidence at trial was Wilbur's statement that he had attacked the victim "in a frenzy provoked by Hebert's homosexual advance." 421 U.S. at 685, 95 S.Ct. at 1883. The charge was murder and the defense was justification, or in the alternative that the homicide was merely manslaughter, on the theory that the killing "occurred in the heat of passion provoked by the homosexual assault." *Id.*

The distinctions between *Mullaney* and the instant case are apparent. In *Mullaney,* the issue of fact was litigated before the jury: Did the defendant kill the decedent intentionally, without passion, or did he kill the decedent in the heat of passion on sudden provocation? The evidence presented no such issue to the jury in the case at bar.

The trial court in *Mullaney* charged the jury on both murder and manslaughter. The jury was instructed, in substance, that every intentional killing was presumptively committed with malice aforethought. Such malice "was to be conclusively implied *unless the defendant proved* by a fair preponderance of the evidence that he acted in the heat of passion on sudden provocation." *Id.* (footnote omitted; emphasis added) The court's charge thus shifted the burden of proof from the State to the defendant on the very issue of fact on trial before the jury. The Supreme Court found this action constitutionally impermissible:

> The issue is whether the Maine rule requiring the defendant to prove that he acted in the heat of passion on sudden provocation accords with due process.
>
> . . . . .
>
> We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation *when the issue is properly presented* in a homicide case.

421 U.S. at 692, 704, 95 S.Ct. at 1886, 1892 (Emphasis added)

In the case at bar, the trial judge did not shift the burden of proof of manslaughter or of any crime to petitioner. He did not charge manslaughter at all.[3]

---

**3.** The trial court specifically eliminated manslaughter from the jury's consideration:

> Now, that presumption, that an unlawful killing is second-degree murder, can be rebutted, members of the jury, in two ways: upward and downward. It can be rebutted upward by the State showing beyond a reasonable doubt that the killing was first-de-

Indeed he could not have, for the issue of manslaughter was never "properly presented" to the jury.

As for the "presumption of second-degree murder," on the facts of this case that presumption favored petitioner. The jury was offered a choice only between first-degree (felony. murder) and second-degree murder, and then told that if it found petitioner to be guilty of an unlawful homicide the murder must be presumed to be in the second degree unless the *State* proved differently.

Thus, notwithstanding the broad language of certain New Jersey cases which suggest that one degree of homicide is presumed over another, but which are not now before this Court, petitioner was not prejudiced by the trial court's failure to charge manslaughter. He was never required to shoulder the burden of proving the lack of any essential element of the crime with which he was charged and of which he was ultimately convict-

ed.[4] *See United States ex rel. Castro v. Regan*, 525 F.2d 1157 (3rd Cir. 1975).

Petitioner could have been convicted of first-degree murder, as he was, only upon a theory of felony murder and only if Friedman's testimony were believed beyond a reasonable doubt. It should not be overlooked that petitioner was twice tried and twice convicted of this crime. The first jury was told that it could not convict him of homicide unless it found him to be a knowing participant with Sinclair in an attempted robbery when Sinclair shot the victims. That jury rejected petitioner's attack on Friedman's credibility, found petitioner guilty of first-degree murder and refused to recommend life imprisonment.

Upon review it was determined that a new jury should be offered the alternative of the lesser charge of second-degree murder. A second jury then heard the case. This jury was given the following options by the trial court: guilty of first-degree murder (with or without

gree murder. It can be rebutted downward if the evidence shows that indeed it was not second-degree murder but was no more than manslaughter, with which we are not concerned here. *Again, let me point out to you that we are not concerned with the downward grade of this murder to manslaughter.* . . . The question of manslaughter plays no part in your consideration in this particular case.
Tr. 990 (Emphasis added)
Although petitioner's counsel specifically excepted to use the word "murder" in the italicized sentence, he made no objection to the court's exclusion of manslaughter from the jury's consideration. (Tr. 1017)
Were the issue material in the instant case, this Court would have substantial doubts concerning the *Mullaney* viability of the "semantic distinction" between requiring a defendant to prove manslaughter and phrasing the requirement of proof as "if the evidence shows." *Cf. United States ex rel. Castro v. Regan*, 525 F.2d 1157, at 1160 (3rd Cir. 1975). The only parties to a criminal proceeding are the prosecution and the defense; if the evidence is to "show" anything, one party or the other must present it.
4. The court gave the following instruction:
As I told you before, the statute of the State of New Jersey provides that the jury, before whom any person has been indicted for murder is tried [sic], shall, if they find such per-

son guilty thereof, designate by their verdict whether it be murder in the first degree or murder in the second degree. The law, members of the jury, presumes that *all unlawful homicides or killings* are murder in the second degree. That presumption, of course, is a rebuttable one, and it is for you, members of the jury, to determine whether or not the presumption of murder in the second degree has been rebutted *assuming, of course, you find the defendant has committed an unlawful homicide.*
Tr. 989–990 (Emphasis added)

Now, if the State of New Jersey proposes to raise the criminal responsibility for an unlawful homicide from murder in the second degree to murder in the first degree, *the State must sustain that burden of proof beyond a reasonable doubt* that the killing of these decedents were [sic] committed while the defendant Wilson and Sinclair were acting in concert in the perpetration or attempting to perpetrate a robbery.
Tr. 990–991 (Emphasis added)

Now, as I have previously indicated, in order to find this defendant guilty of any of the offenses I have mentioned, *the State must prove all of the essential elements of that offense beyond a reasonable doubt.*
Tr. 992 (Emphasis added)

a recommendation of life imprisonment) if it found that Sinclair and petitioner had been jointly engaged in an attempted robbery when Sinclair fired the shots; guilty of second-degree murder (a) if it found that Sinclair had committed felony murder but that petitioner's capacity had been so diminished by his voluntary intoxication that he had been unable to form a specific intent to attempt robbery, or (b) if the jury disbelieved Friedman's testimony as to the fact of the attempted robbery, but found that petitioner aided and abetted Sinclair in the shooting; or outright acquittal if it found that neither first- nor second-de-

gree murder had been proved beyond a reasonable doubt.

This jury, too, rejected petitioner's attack on Friedman's credibility and convicted him of felony murder, refusing the opportunity for leniency afforded both by the lesser offense and by the opportunity to recommend life imprisonment under the higher count.

Upon this record it is impossible to find constitutional prejudice in the court's failure to offer the jury manslaughter as yet a third lesser alternative, even if the omission of the manslaughter charge were error.[5] Further-

---

5. Had petitioner been convicted of second-degree murder based on the theory of his diminished capacity to commit felony murder, because of his drunkenness, an interesting constitutional question might be raised.

Felony murder, as defined by New Jersey and most states, is a doctrine imposing responsibility on one who kills, whether he intends to kill or not, if he does so while committing some other felony. The doctrine is premised upon a theory of "transferred intent," and holds that in such circumstances the element of intent to kill required for the crime of murder, and the elements of wilfulness, deliberation and premeditation required for murder in the first degree, are supplied by the defendant's "intent" to commit the underlying felony, defined as his "man-endangering state of mind," even in the absence of a specific intent to inflict any injury at all. *State v. Suit*, 129 N.J.Super. 336, 344, 323 A.2d 541 (App.Div.1974); *State v. Madden*, 61 N.J. 377, 385, 294 A.2d 609 (1972). With regard to the mere accomplice of one who commits a felony murder, however, the law imposes yet a second imputation of intent. Such an accomplice is held accountable for the acts of his accomplice or coconspirator under a theory of agency which makes each responsible for all that the other says and does within the scope of the illegal enterprise. This theory is predicated on the rational and necessary premise that when men intentionally join together to achieve a common end, not only the end achieved but the means used are their common responsibility.

In *State v. Maik*, 60 N.J. 203, 287 A.2d 715 (1972), Chief Justice Weintraub wrote for a unanimous Court:

Cases may also be found which say that voluntary intoxication may be a defense if it in fact prevented the formation of a "specific intent" required in the definition of a particular offense. See Annotation, 8 A.L.R.3d 1236, 1246 (1966). The distinction thus made between a "specific intent" and a

"general intent" is quite elusive, and although the proposition stated in the preceding sentence is echoed in some opinions in our State, see *State v. White, supra*, 27 N.J. [158] at 165–167, 142 A.2d 65; *cf. State v. Letter*, 4 N.J.Misc. 395, 133 A. 46 (Sup.Ct. 1926), it is not clear that any of our cases in fact turned upon it. A similar proposition has played a role in homicide cases. There, the voluntary use of liquor or drugs has been held to be relevant in determining whether the defendant in fact performed the mental operations necessary to raise a murder from second degree to first degree. But the influence of liquor or drugs thus voluntarily taken, no matter how pervasive that influence may be, will not lead to an acquittal. It cannot reduce the crime below murder in the second degree, and this because of the demands of public security. See *State v. Wolak, supra*, 26 N.J. [464] at 477–478, 140 A.2d 385; *State v. White, supra*, 27 N.J. at 165, 142 A.2d 65; *State v. DiPaolo, supra*, 34 N.J. [279] at 295–296, 168 A.2d 401; *State v. King*, 37 N.J. 285, 297–298, 181 A.2d 158 (1962); *State v. Hudson*, 38 N.J. 364, 368–369, 185 A.2d 1 (1962); *State v. Trantino, supra*, 44 N.J. [358] at 369, 209 A.2d 117. This is equally true as to a felony homicide. Thus a defendant who in fact participated in the felony in which the homicide occurred, can seek nothing more favorable than a conviction of murder in the second degree by proof that he could not, on that account, form the intent to commit the felony. Again, the limitation rests upon the demands for public security. *State v. Sinclair*, 49 N.J. 525, 544, 231 A.2d 565 (1967).

287 A.2d at 721.

As applied to the facts of this case, this rule of law would certainly be constitutionally permissible if it were Sinclair whose intent was diminished by the prostration of voluntary intoxication. When a man kills with a gun, there is no unconstitutionality in a rule which holds

more, it is simply beyond rationality to suggest that still a third jury, given three counts instead of two, would reach a different verdict if petitioner were afforded yet a third opportunity to test the credibility of the Friedman testimony.

For all the reasons set forth in this opinion, the petition for a Writ of Habeas Corpus will be dismissed. No evidentiary hearing is necessary and there is no probable cause for appeal.

---

him to some criminal liability regardless of his voluntarily diminished intent, "because of the demands of public security." If petitioner's intent were prostrated, however, it may be that he could be guilty of no crime at all. His liability for the shootings done by Sinclair can only be premised on his knowing and wilful combination with Sinclair in an underlying criminal enterprise. As noted, when such a combination is established, the agent stands in the same position as his principal and is guilty of whatever crime the principal commits.

Here, however, it is not the killer who was intoxicated, it is the accomplice. This is not the situation to which the Chief Justice addressed himself in Maik. In the instant case, after charging the jury that petitioner could be guilty of first-degree murder if the killings occurred during the commission of a robbery or of an attempted robbery in which petitioner and Sinclair were acting in concert, or of second-degree murder if the killings did not occur during an attempted robbery but petitioner was intentionally aiding and abetting Sinclair in a second-degree murder, the court then supplied an alternate theory by which the jury could convict petitioner of second-degree murder, in the following instruction:

> Now, there is evidence in this case that Wilson was intoxicated. If you find that he was so prostrated by intoxication as to be unable to form a specific intent to attempt robbery, then such a condition would reduce a robbery-murder, a first-degree murder, to murder in the second degree.

Tr. 994–995.

Just as Sinclair could properly be convicted of felony murder for deaths he caused in the course of the intentional perpetration of a felony, so could petitioner be convicted of felony murder if he wilfully associated himself with Sinclair in the perpetration of the underlying felony. Each defendant's general felonious intent would substitute for the intent to kill or to do grievous bodily harm required for murder, and for the deliberation and premeditation required for murder in the first-degree.

Under the facts of this case, however, had petitioner been convicted of second-degree murder after such an instruction, a substantial federal constitutional issue might have been presented by this petition.

The intent to agree to effect the goals of a criminal enterprise is the linch-pin by which the acts of the principal, and their consequences, are attributed to the passive agent. Where the passive "agent" is "so prostrated by intoxication as to be unable to form a specific intent" to commit a crime, however, it is difficult to understand how he is more than a bystander, and how he becomes an agent at all. He may, in such circumstances, simply be incapable of that wilful association and alliance to effect a criminal end which is the only basis upon which the acts of another may be attributed to one who does not commit them himself. Petitioner's conviction of second-degree murder might, on that alternative theory, have presented a fundamental constitutional paradox. If petitioner was so prostrated by intoxication that he was unable to arrive at a conscious meeting of the minds with Sinclair, there would be substantial question regarding the rational basis for holding him liable for murders committed by Sinclair, especially where Sinclair may not even have intended to commit them himself.

Since the jury, like its predecessor, rejected the option of finding petitioner not guilty of felony murder, petitioner was not prejudiced by the proceedings at trial. Only if the jury had returned a verdict of guilty of second-degree murder would this Court have been required to determine whether the trial court's charge on intoxication, intent and the degrees of murder would compel the granting of the Writ.